The final case to be called today is Chambers v. Whirlpool. Before we begin, I want to thank the courtroom deputy for spending a lot of time with the counsel to figure out the ordering of the parties. I think the agreement was Whirlpool will go first, then the objectors, then the state attorneys general, then the plaintiffs, and then Whirlpool and the objectors could have rebuttal if they wish. Thank you, Your Honor. May it please the Court. Andrew Pincus for defendants. I'd like to reserve three minutes for rebuttal, and I'd like to begin with the attorney's fee issue. The touchstone for determining whether an attorney's fee is reasonable, as CAFA and courts have emphasized, is ensuring alignment of counsel's interest with those of the class. In particular, as the HP Inkjet Court put it, by tethering the value of the fee award to the value of the class recovery. The district court here erred in three ways. First, CAFA states that if coupons are taken into account in setting the attorney's fees, any fees relating to the coupons must be set by the percentage of recovery method based on the value of coupons actually used by class members. That means that the court must either use the percentage method to set the fees relating to the coupons and set fees with respect to other relief based on the Lodestar, or set the entire fee by reference to the Lodestar but disregard the coupon element of the settlement, and the district court did neither here. Second, even if it were permissible to use the Lodestar approach to set the entire fee award, the court here erred by making a contested multiplier decision without determining the value received by class members under the settlement. And third, to the extent that the Lodestar method is used, the facts here preclude any upward multiplier as a matter of law and require some downward reduction of the Lodestar. So turning to CAFA, I think there's no doubt that it applies to all class action settlements in federal court, regardless of the underlying claims. EZ Saver makes that clear. And that subsection A mandates a percentage of recovery method whenever there's a coupon component, and B says if you use the Lodestar, you must ignore the coupon relief. That's what the court said in EZ Saver and also what the court said in Inkjet, and that was not done here. So for that reason alone, the district court's ruling can't stand. With respect to the multiplier decision, two critical issues on the multiplier are whether the attorney's fee award is tethered to the value of class recovery, and second, assessing the results obtained via the claim. And both of those determinations require that the value obtained by the class be valued, and the district court didn't do that here. It simply said that there was an impressive settlement and recognized the vastly different valuations submitted by the parties but didn't resolve those questions. I know it's not on the record because the court approved the settlement before valuing the coupon redemption value. Do we know what that is? We know how many claims for coupons were made. They haven't been redeemed yet. Those claims haven't been assessed. The coupons haven't gone out. But we know that there were approximately 122,000, I think, coupon claims. Let me double check. Well, haven't many of them been redeemed by now with the passage of time? No, they have not been distributed yet. So the claims process has gone on. There have been claims for coupons. There have been claims for past overheating events, which is a second element relief. And there have been claims for future overheating events, but the claims administrator hasn't processed any of those claims. So clarify this for me. I'd appreciate being clear about the facts. At the time the district court rendered its decision, there were no redemptions of any of the coupons whatsoever, I believe, right? Correct. All right. Since then, I think there was 120 days by which some of these coupons, perhaps many of them, could be redeemed by a certain cutoff time. Hasn't that happened? And how many are we talking about? So there haven't been redemptions. So the claims process was first. Class members got the notice and had to submit claims for the coupons. The claims have been received, but the coupons have not gone out. Even to this day, we do not know enough information to ascertain the redemption value. Well, we know one of the critical questions, which is how many requests were received, and it's about 117,000 were received as of June 10th. So we know how many have received, which obviously cuts off the possibility, and I think we know, based on what experts have said, there is experience with redemptions that would allow a district judge to make an assessment of how many would be redeemed. So the district court is in a better position now, if we were to send it back to the district court, to make some rational calculation about what we're dealing with when it comes to redemption values. Yes. The district court is in a better determination with respect to all of the elements of the settlement, because there's much more information with respect to all of the elements of the settlement. So first of all, as I mentioned, we have the redemption. We have the requests for coupons, which sort of sets a ceiling. Second of all, we have all of the claims for past overheating events have been filed. They haven't been assessed. There are some flaws in them in terms of not providing the documentation required, but the district judge could, the claims administrator could process them, and the district court could have an assessment. With respect to the future overheating claims, a large part of the period in which those claims have been made have been cut off, because there was a timeline in terms of the date of sale. Well, what options, realistically, did the district court judge, the beleaguered district court judge have, faced with the factual dynamics he had to deal with vis-à-vis the settlement? What really else could he have done? Well, he could have, there were expert valuations of the settlement. It's not unusual that district courts, as Your Honor knows, have to value future events, future wages, future lost profits. There are many situations where district courts have to assess competing submissions about what's going to happen in the future and make a judgment, and that's what should happen here. Now we have the benefit that if the cases were mandated, we don't have to do that. But at the time, the district court certainly could have waited for the initial claims period to arrive. Could have waited, but I think he said, look, this is a tough cup of tea. I just can't come to a rational decision, he asked, in the valuation of the settlement, the class, or the redemptions. What is he supposed to do? Well, with respect to the district judge, as I said, district judges all the time have to come to that assessment. Who is censoring the district court judges? I'm visualizing me as a district court judge. If I ever get demoted to that level or resume my responsibilities as a district court judge, it's a tough cup of tea for the fact finder to have to wrestle with. We can sit here as a circuit court judge and pontificate about this, but in the real world, you're dealing with these tensions and conflicts here, and I just wonder whether there's a real way for a district court judge, in this particular case, to make rational decisions, given the truncated nature of where we're at. Well, with respect to some elements of the settlement, it wouldn't have taken long. The claims process for the rebates, for the coupons, and the claims process for the past overheating events was underway, and if the district court had just made it a couple of months, those would have been locked in. Could have waited a few months. Those would have been locked in, and so there would have been much more information. But if the district court didn't want to do that, and he could have staged the process of attorney's fees, if he didn't want to do that, I think he had an obligation to look at the competing expert reports and make a judgment, the same way courts do when they have to award future profits or lost wages, or frankly, there are two basic components, as Your Honor knows, to an attorney's fee award. There's the load star, and then there's the multiplier. The load star requires the district judge to look at a lot of information and make decisions about hours. I used to say I don't mean to interrupt you, but when I do mean to interrupt you, I changed that habit of mine a long time ago. Is there any question here as to the correctness of the load star calculation by any of you folks? There isn't. But I was just trying to make an analogy that for that part of the judgment, there are a lot of facts that are submitted about prevailing rates, about whether the amounts spent were reasonable, whether the level of lawyers working on them were reasonable, and courts make determinations. The multiplier here is $6 million. So we're dealing with the multiplier here and not with the load star calculation? Yes. I just want to understand whether everybody agrees that $8 million is the starting point, so to speak. Well, we don't agree with that because under one formulation that's right. If the fee award is going to be made without reference to the coupon relief, then the load star is proper. If the coupon ‑‑ if the alternative calculation is to make the percentage of recovery calculation with respect to the coupon relief and a load star with respect to the other relief, and if that happens, the load star has to be reduced to account for sort of the proportion of the other relief to the coupon relief. So in that sense, there's a dispute. But there's not a dispute on the underlying calculation. I guess what I'm trying to clarify is there's no factual dispute. No factual dispute on the underlying calculation. The only point I was trying to make is we recognize that the load star calculation requires the judge to make a lot of assessments about facts. And here the multiplier is $6 million. It's two-thirds, again, as much money. And it doesn't seem unreasonable to say that the district judge also has to resolve these dramatically competing assessments of what the real value of the settlement is. Because the critical question here is tethering the incentives of class counsel to the class, and the real value of the settlement is critical there. So when the multiplier is disputed, that is a critical element of that determination, and it's a critical element of the determination of assessing the ‑‑ what the class counsel achieved versus what was sought. So when you folks engaged in the finalities of the settlement arrangement, and you have these various aspects to it, various different types of coupons, various different dynamics, some spread out for many years yet, you created all this problem for the district court judge? Well, it's a different kind of settlement, obviously, than one is for a fixed amount of money. But the district court judge had the benefit of the expert reports for both parties and could have engaged in some analysis of that. Our view is just ‑‑ Was that realistically possible? The expert reports vary so significantly. I mean, it seems like you're dealing with a lot of speculation, a lot of guesswork here, and it's kind of tough to really pin down what the value of the settlement is, let alone the redemption value. Well, for the ‑‑ You think it can be done on this record? I think it can be done, and we've talked about it in our brief. As I said, the coupons, at least we know, the district court would have known with just a little bit of delay how many coupons were going to be requested. And there's lots of data on once a coupon is requested, how many of them are redeemed. That's not a mystery. With respect to the overheating events, the past overheating event claims would have been submitted, and while the future claims would still be out, those past claims would have provided a very valuable indication of how many future claims there were. You know, the plaintiffs have a very large claim number in terms of how many overheating events there might be, but the claims that were submitted in terms of the future, in terms of the past overheating events, tell you a lot in terms of what was going to be claimed for the future. So, you know, past overheating claims, 10 days after the claim deadline, 27,000 were submitted, many of those not documented. But those, obviously, for a large period in the past, give you a very significant basis for looking at what was going to happen in the future and determining that the plaintiff's estimate of 28,000 claims a year for five years, when there were only 27,000 filed for the whole past period, was a totally unreasonable estimate of what the claims would be. Yeah. Do you wish to talk a little bit about Inkjet and EasySaver? That's really where my focus is in a large respect here. Well, as I said at the beginning, I think Inkjet and EasySaver tell us that CAFA applies to this case and that when there is a coupon settlement, the court has two approaches in terms of how to set fees. If, with respect to the coupon part of the settlement, fees have to be set by a percentage of recovery method. The court then can use the load star to set the fees for the rest of the settlement. With respect, the alternative is to say, we want to use the load star, but we're going to totally disregard the coupon relief. We're only going to base it on the other relief, and obviously that has great consequences in this case for the multiplier question. Well, you only have a minute and 43 seconds. I have a lot of questions I want to explore with counsel about the interaction between the Inkjet case and EasySaver. Maybe you're not the right person for the other questions. I'm happy to answer them, Your Honor. Answering your questions is the most important reason I'm here. Maybe we'll see how it goes with the other folks. Thank you. I'll save the balance of my time for rebuttal. Good morning. Robert Clore for the appellant, Christine Knott. I'm going to try to use three minutes of time and reserve four minutes for my co-counsel and then additionally reserve three for rebuttal. May it please the court, everyone except class counsel agrees that the $15 million fee, which according to Whirlpool is five times actual class recovery, violates CAFA and requires reversal of the fees. The nine attorneys general and objectors also urge that the CAFA violation here requires reversal of the settlement. Obviously Whirlpool wants to preserve what it calls a nuisance settlement, but strict scrutiny was not applied to the settlement under CAFA. The court should have analyzed the actual value of the settlement in terms of the redemption rates. It didn't, and keep in mind we're talking about 10% to 15% rebates to buy more dishwashers that are potentially life-threatening products. In HP Inkjet, this court reversed the whole settlement and not just fees because, quote, it's a package deal and must stand or fall in its entirety. The exception to that rule is an easy saver when the settlement is structured such that the excess fees can be returned to the class. In that setting, the CAFA violation can be corrected by reversing fees alone. Here the party segregated the fees from the class, so any reduction in fees benefits only Whirlpool and not the class. So that's effectively a reverter. Whatever Whirlpool doesn't pay in fees stays in its pockets. The party's response is there's no clear sailing provision, and so collusion isn't present. But we have two of the three Bluetooth factors in this case. We have one, a gigantic disparity in fees versus class recovery, and two, what is effectively a reverter. You don't have much time, so let me focus attention on approval of the settlement itself. Other people are talking about fees. We're going to hear about fees. What I want to hear is how is it that your client is Ms. Knott, I believe. Correct. And other in the class, how are they hurt by this settlement? What have they given up? Well, they're hurt in that it's our position that there's more money out there or that there's more relief out there and that class counsel have made off with a lion's share of it. So that's the number one way. The money being paid to class counsel comes from Whirlpool. It's not from a pot. You can argue that maybe a different kind of settlement would have been created, but Whirlpool agrees to this settlement, leaving itself vulnerable to be hit up the head with a fee award, which it objects to. I'm not sure how Ms. Knott has any injury. That's the fight between plaintiff's counsel and Whirlpool, but there's no sign that a different fee award is going to put any more or less money in Ms. Knott's pocket. So I come back to the question, how is she and her colleagues, how are they hurt? Well, we don't believe you can look at it in isolation, the fees and the class relief. We believe that obviously class counsel believe they could get 15 million out of the deal. And Whirlpool is valued. But it didn't take a penny out of your client's pocket. Well, we would argue that constructively it did. There's 2 million. We believe that the 2 million value of the settlement versus 15, the disproportionate nature of the fee to the class recovery demonstrates that there's something left on the table. And that's how your clients hurt? Because you think there's something left on the table through the fee award? Is there any other way your client is injured? I think when speaking to the class as a whole, I think any time an attorney fee exceeds class recovery by five times, the class is by definition hurt. Well, that suggests the fee award should be changed. It really doesn't tell me anything about how the settlement is unfair to your client. And I accept you're saying to the contrary. I'm telling you I'm not persuaded. I'm looking to see if there's anything else that you have to cite to object to this settlement. Separate from the fee award, what's the injury to your client from this settlement? I would say the same injury that existed in the HP inkjet case, which is to say that the CAFA violation, the CAFA was designed to discourage coupon settlements and to discourage attorneys from inflating settlement value to get egregious fees. And the HP inkjet didn't just reverse fees, it reversed the settlement. With that, I'll let my co-counsel speak. And I'll start with the same question. See if you can give me an answer that satisfies me any more than the last one did. May it please the Court. I'm Sammy Arelli, and I'm representing my mother as the personal representative of my grandfather, George Lycopolis, as a state. And on your question, Your Honor, about injury, the injury is all in Rule 23A. There's unlawful commingling of valuable claims, the claims of my grandfather, with his dangerous dishwasher and valueless claims. Well, let me stop you right there. What made your grandfather's claim any more valuable than anybody else's? It didn't catch fire, did it? Not yet, Your Honor. And how old is this dishwasher? About a decade old. Well, it's got to be more than that because the time period is so it was purchased at least like what, 14, 15 years ago? So, Your Honor, that question. Answer that question. Yes, it was. It's an old dishwasher. And so it's an old dishwasher. Has it burst into flames yet? Not yet, Your Honor. Not yet. What's the useful life of a dishwasher? Your Honor, there's some stuff in the record about useful life. As far as I'm aware, you usually use it until you decide that you want to replace it. Yeah, or until you redecorate your kitchen or something. But, Your Honor, in the case of So what makes your grandfather's claim so valuable? I mean, your brief talked in grand terms about the potentially catastrophic result. I didn't see anything that told me that your grandfather was being expected to give up a claim of great value. And, indeed, if it did burst into flames, my impression is that's not released by this settlement. So what is it about this settlement that injures your family? So, Your Honor, part of if it did burst into flames is released by the settlement. The question of maybe the collateral cost of rebuilding the house and the kitchen and his personal injury claims, those weren't released. But his claims related to the device itself were released. And I'll point out that three times as many So he loses out on a 14-plus-year-old dishwasher. Your Honor, respectfully, our brief is not What's the injury? I'm having real trouble finding out where the class members have been disadvantaged by this settlement. Your Honor, the Supreme Court's decision in Ortiz says that, as a matter of law, we've been disadvantaged because our claims have been improperly commingled with valueless claims, which is not permitted by the Supreme Court's rule. What are the valueless claims? The valueless claims are the claims that Whirlpool didn't even want to release against for the three times as many non-class members, including six people who get $4,000 apiece that don't even represent class members. All of those are violations of Rule 23A, which the district court didn't even analyze in its final approval order, which is required by Walmart v. Dukes and is required by four other circuits. And we believe this circuit should require as well. And since I just want to save some time for rebuttal, I'll just point out that my grandfather deserved better than to be called names by class counsel and by the district court for respectfully raising an objection. And we are calling on this court to join the other circuits and not permitting argumentum ad hominem against objectors who bring good-faith objections. Rule 23 gives people an opportunity to object, but it does not give plaintiff's lawyers and the plaintiff's bar a license to smear objectors unfairly, like was done to my grandfather. I thoroughly agree with the characterization of some of the attacks against this category called objectors. But I have to say it would be better to have a sense of what the real objection was. And I've struggled here to try to figure out how the objecting class members have been particularly hurt by this settlement, and I haven't found much. So, Your Honor, I think— So I ask the question to you. I ask the question to your fellow counsel. I still haven't heard very much. And, Your Honor, our view is that you have to look at this as a constructive common fund. There's only one payer. And so the fact that you see the amount of money that's going out, that money could be distributed other ways. It's sort of basic economics about who's sitting on the side of the table, and this is why the Supreme Court in Ortiz said you can't commingle valuable and not valuable claims. And I'll reserve the rest for rebuttal. Thank you. Judge Lee, may it please the Court. My name is O.H. Skinner, and I'm here from the Arizona Attorney General's Office. We see an error here going to coupons, CAFA, and the fees. We think that it's important for the Court to identify that error and confirm the authority of Inkjet and E-Z Saver because that serves a very important purpose for consumers across the country in these class action cases. However, the Court decides to handle the remedy of the error with respect to a remand or not. I understand that Inkjet, at the time we filed our brief, had set forth one way to handle these cases. Tell me what you think the error was. Of course, Your Honor. The multiplier at a minimum here stands on the shoulders of coupon analysis. Okay. And the plaintiff argued for the multiplier through reliance on the coupons. That's at ER 592 to 594, 599 to 603. The Court then cited the coupons as one of the grounds for the good outcome that warranted a multiplier. And so the coupon relief was argued for and considered as part of the multiplier at a minimum, and E-Z Saver at footnote 12 speaks very clearly to this. We also believe Inkjet does as well, that when the party presses for a multiplier, that was exactly the issue in E-Z Saver, based on the coupons, once that occurs and once the Court has to then wait to see what the coupons redeemed are before awarding the multiplier, because that is the basis of CAFA is to ensure that coupons redeemed. I get that, but that might take years. So the Court in E-Z Saver, in particular at the argument where we presented argument, discussed how you can bifurcate, and there was some discussion you had with Mr. Pincus, you can bifurcate a fee award where you can award fees that you don't believe turn on the coupons on a certain day, and then you can have a process where money is set aside and the parties return on a rolling basis and say, because when a claim is redeemed, there's not a dispute about its value. And so when a coupon is redeemed, you can come back on a basis and say, in this period of time, X number of coupons have been redeemed, and the fee for that is. So the district court retains jurisdiction for perhaps many, many years and adjusts the fee awards periodically? Is that what you claim should be done here? When the parties structure a deal where there is a finite coupon redemption period, and here it's not an infinitely long coupon redemption period. Well, there are different periods here. There are different periods. As to the bulk of the coupons claimed here, 100,000 of them, there is a finite period in which the coupons would need to be redeemed, and the court is surely within its authority, especially here where the money is a contested fee separate from the award to consumers, to revisit that, and as the claims come in, process fees accordingly. Some of these may come in many years later. Am I reading this incorrectly, your settlement? It is entirely conceivable that that would happen, and that's where, to the extent that the court was uncomfortable with that process of waiting and understanding that the lion's share of the available coupons would be coming in the very front end of the period. Of course, this court has also identified the possibility of experts to analyze what the redemption rates would be. Ultimately, these are problems that are generated through the parties' negotiation of the settlement, but that doesn't mean that when a court, you know, Inchette and E-Z Saver are very clear that when the parties press for a multiplier based off of coupons, and that alone, if you believe E-Z Saver footnote 12, binds the court to having to look at the redemptions, but then the court here cites the coupons as a basis for the multiplier. The difficulty of handling coupons doesn't change what CAFA says. It might be a reason why you would want to bifurcate or approach it in other ways, but you can't just look past the redemption rates entirely, which is what we believe occurred here. Well, could we just say the load star was calculated, $8 million, and just leave it at that without dealing with multipliers or coupon redemptions? There's language in E-Z Saver that certainly seems to say that the underlying load star, when it's not being calculated with any reference to the coupons, might be an available path forward. That's why I focus so much here on the multiplier. That would not be a CAFA violation, then, would it? It is not at all. It's not entirely clear that that would be a CAFA violation, like it would be a CAFA violation to rely on coupons in awarding a multiplier, Your Honor. So here, the most important thing that we ask is that the court identify the error, provide, confirm Inchette and E-Z Saver, provide guidance to district courts so that consumers are put in the best position because there will be very, there appear to be very few cases in which there is a contested fee. More often, courts are not given the opportunity of a contested basis for hashing this out, and having this court confirm what it has said in Inchette and E-Z Saver would produce a very positive outcome for consumers in these cases that we see so many of. With that, thank you, sir. One question. It wasn't clear to me from the briefs. Are you asking just that the fee awards be reversed or the settlement itself? I should be. I tried to address this, Your Honor. I apologize. At the time we filed the brief, we believed that any error in the fee necessitated a reversal of the settlement because of language that had come in cases like Inchette. E-Z Saver has perhaps changed that analysis, and at this point we are just asking the court to identify the error with the fee calculation, confirm how the courts are supposed to handle it, and we don't have a position as a group as to what E-Z Saver means in this particular context, but our briefing was focused on the pre-E-Z Saver world. Thank you. Thank you. Good morning. May it please the Court, my name is Steve Schwartz, and I represent the plaintiffs and the class. I'd first like to address Judge Clifton's question, how are the class members harmed by this settlement? And I can tell you that we got every single penny out of Whirlpool that there was to be gotten, and the fact that we did much better on the fees than Whirlpool ever imagined, it doesn't mean Whirlpool had money it would have given to the class instead of given to us. Every penny we got. Potentially there's $100,000 that went for the websites and a few additional payments of $4,000 to individuals. That was not from the fee award, that was from the pool that was presumably available to plaintiffs and class. So let's start with that. Why isn't that a problem? It's not a problem because with respect to the Chambers website purchase, the Court applied heightened scrutiny at preliminary approval, before we even filed preliminary approval papers, asked us for detailed declarations from all the class representatives, because Judge Ledeen was proactive, which was not required under the rules then, and he took a very hard look at the website sale. Whirlpool was the one that insisted on it, not Mr. Chambers. Mr. Chambers was the model class representative who gathered incredible information, which helped us put the lie to Whirlpool's claim that there are only a few hundred of these overheating events and hardly any fires. And their bottom line is that even Mr. Fleur's client is not at her deposition, since they never told her why Judge Ledeen approved that payment. When I showed her Judge Ledeen's three pages on that from his preliminary approval order, she said it makes sense because it makes sense. More fundamentally, how are the class members benefited by the settlement is the real question in this case. This is a warranty case. If people had a past overheating event, they're going to get 100% cash recovery of their damages. If they have a future overheating event, they've got for washers that have long passed their expected 10-year useful life, they're going to get an insurance policy, typically known as an extended warranty, where if they have an overheating event, they either get $100 cash or 30% off dishwashers, which on average are between $600 and $1,000. That is either a full recovery or near a full recovery of future overheating events. Because the issue for safety that made the difference between internal fires within the washers and external fires that escaped the washer was this TCO problem, the thermal cutoff, where it was shutting down a machine for no good reason, Whirlpool and Sears authorized technicians, and other professional technicians were disabling it because it kept on shutting down the machine. That's why the safety relief was focused on the TCO problem. And what the objectors have said, well, why would a technician ever bypass a thermal cutoff? Well, they were doing that, and that was the cause of the fire. So whatever Whirlpool was doing wasn't good enough. The coupons were a back-end add-on for people like Mr. Mirrelli's grandfather, who had a 15- or 17-year-old machine, have never had a problem, they've gotten the safety relief so that the technicians won't make the mistake that was being made before, and he can still get something. So the bottom line is for our warranty claims, Judge O'Gean, the qualitative analysis that the EZ-Saver court said was a proper analysis, and on a qualitative analysis, this settlement was either a full or near full recovery for the out-of-pocket damages for class members. And keep in mind, personal injuries not covered by the release and damage to anything other than the machine, the washer, also not covered, so those are still viable. You make a good case that the settlement provided value to a class, but the parties are at opposite ends in terms of the valuation. I think plaintiffs say around, excuse me, Whirlpool says around $4 million, plaintiffs say around over $100 million. If it turns out the settlement value is $4 million, then how could attorneys' fees of $15 million be justified? I think the answer to that question is the answer to the same question that Judge Block asked, which was what could the district court have done in this case because there is this confounding competing evidence in this very unusual contested fee process. What could he have done? He could follow the law. Hyundai tells us what the law is. Hyundai tells us the same thing what this Court's 2016 decision in Yamada tells us, which is if a district court doing its job takes a hard look at this competing valuation evidence and determines it's not easy to get a dollar value, which is the exact factual finding that Judge O'Geen held here, then the court has discretion to dispense with the payloads. But the district court here seemed to have just kind of thrown its hands up and says the gap is too big and didn't really analyze it. I mean, judges do this in class cert. Experts provide wildly varying damages calculations, and judges look at it and they at least try to make some valuation estimate. Here, I don't see anything other than the judge seeming to say, well, $4 million, $100 million, that's a huge gap. I'm not going to bother with it. I disagree in terms of what Judge O'Geen did with respect to the evidence, and I also disagree with the law. I'll take the law first. Hyundai makes clear, the en banc decision, that it would make no logical sense to require a cross-check, a percentage valuation cross-check if there are difficult valuation issues because the Lodestar is a reasonably presumptive fee. Now, in this case, unlike the Lodestar determinations in Hyundai, in most of the other cases that we've seen in this court, Judge O'Geen had our detailed daily time records. So we poned them up. He examined them. Whirlpool had our detailed daily time records. This Lodestar determination is probably the most robust Lodestar determination ever in a district court. And Hyundai, in the same breath, in literally the same paragraph where it says, you do not have to do a cross-check. It makes no logical sense to do it if the value is not easily monetized, went and said that the standards to evaluate multipliers are the Hanlon-Kerr standards, and disagreed with the dissent that it should be the statutory fee-shifting standards that were discussed in Purdue. Here, these include the coupon settlement, and doesn't NRA, HB Inkjet, control here where we said that for coupon portion of settlement, you have to do by percentage of recovery. I mean, I'm not sure how you get around that. Maybe we were wrong. You know, there's dissent in the case. I know the Seventh Circuit has a different approach, and, you know, looking at it, it's not unreasonable reading, but, you know, we're bound by what the Ninth Circuit has issued, what a prior panelist issued. I'm not sure how you get around NRA, HB, Inkjet. Okay. Well, you're right. It makes no sense to debate whether Inkjet was right or wrong, but Inkjet was a non-cash case, so cash wasn't part of the mix. Inkjet said that Section 1712B, which is the appropriate subsection here, brings you into a different situation where it can use load start. E-Z Saver gives you the answer to this question. What E-Z Saver did is it made the same observation that Judge Olguin did, that when you have a mix of cash plus safety injunctive relief plus coupons, when you have all three of those components, E-Z Saver, like Judge Olguin said, none of the subsections of 1712 expressly cover that one, but E-Z Saver and Judge Olguin both agreed that subsection B is the right subsection. In the original briefing, my friends here said that it was A or C, and they were proven wrong by E-Z Saver, and subsection B says right in there, you can use the load start method with a multiplier, thereby endorsing both load start and the multiplier. So let me try to get some clarity here. As I read HB, Inkjet, it was only a total coupon case, no mixed settlement dynamic in that case. I think that's correct. Correct. No cash. The injunctive relief was. Do we have any case at all which holds that a district court cannot use a load start for a settlement involving both cash and coupon? Yes. That's E-Z Saver. Okay. Hold that in abeyance. So am I correct that HB, Inkjet, this is dicta, that the real holding only dealt with an all coupon dynamic and everything else that's said in respect to carving out coupon versus load start is basically dicta in that case? Well, it's not just that it's dicta, but it's that in HP it made a distinction between a subsection A claim and a subsection B, and that wasn't a subsection B case. Now, this is what E-Z Saver said. It gives you the answer. I'll just quote from E-Z Saver. Well, I'm going to read E-Z Saver, what I really highlighted here. You tell me whether I'm wrong. It says this. This is our case. This is a mixed settlement case. So we have that direct issue to confront in our case right here. Okay. And I think that this is what it says. In particular, in a mixed settlement, which this clearly is, a district court may use the load start approach, provided that it does so without reference to the dollar value of the settlement fund, however you determine that, or, of course, it may reference the dollar value of the settlement fund if it accounts for the redemption rate of the coupon in calculating that dollar value. It seems to me that that is the law that we have to apply here. It may or may not conceptually clash with some of the language in jeopardy. What really puzzles me is that how do we establish the settlement value of the fund? I guess that has to be done, right, on remand, presumably. And we have to deal with the value of the redemption rate as well. But it seems to me that it can be a load start approach that we can use here in a mixed settlement dynamic. Am I reading this incorrectly? You're right about footnote 11 in Easy Saver that as long as you don't reference the dollar value, then you can use the load start approach. And INGED really doesn't address that at all. Excuse me? INGED doesn't really address that. Right, because it was a subsection A case, not a subsection B. And Judge Elgin followed Easy Saver. He didn't know it because it was in the future, but he did not do any references to the dollar value of the settlement. That's number one. Number two, remand is not going to work here. We don't know any more information today than we knew back in 2016 when Judge Elgin wrote his decision. So let me clear a couple things up because the facts were a little messed up in some of the prior presentations. First of all, with respect to the past, there are 26,000 claims for past overheating events with $11 million claimed. In order to evaluate those claims, the settlement administrator, which has said in its declaration, Judge Elgin quoted that, they can't do that until we have a final settlement approval, which God knows when we'll have that, hopefully soon. But it's going to take them a good year to go through all those claims and vet them. So that's for past. For future overheating claims, we're out until at least 2021, but those claims should be valued as to what would it cost in the open market for class members to get the exact same warranty. There are 13 million machines, and our experts said that a similar warranty just for this overheating defect would cost $6 per machine, but even if it's $1 or $2 a machine, we're talking $13 to $26 million. As far as the coupons, the coupons will not be distributed under the settlement until after the effective date, after we have a full settlement approval. So the objectors, by appealing the settlement, had delayed that for years. And then after we get an effective date, then the administrator will send out the coupons, and then class members will have 120 days to redeem them. But the important thing there is the evidence that Whirlpool submitted was it thought the redemption value was between $2 and $4.5 million for those coupons. We thought it was going to be $8. But we're not going to know that answer if you remand until we get a final approval, we're done with the settlement, have another 120 days. And as far as the safety portion, we'll never know whether there was one life saved or one horrible burn victim saved by the safety relief, and we're going to have the same conundrum on that prong as we would have had five years ago or five years from now. We just won't know. So what Judge O'Gean did was he took a look at the past overheating event claims, the future overheating event claims, the safety relief, and the coupons. And for each one of those prongs, he concluded there's a mess of evidence here which is not something that I'll be able to get my hands wrapped around and get a rigid, solid figure that you can rely on. But the law told him that as long as he doesn't allow a dollar value of the settlement to infect his lodestar multiplier analysis, he can do a pure lodestar analysis because as Hyundai confirmed, the lodestar is the reasonably presumptive fee and that you don't have to do a lodestar analysis, a value analysis, and you can even do a lodestar multiplier by simply applying those current handling factors which he did, including how good the settlement was. So Judge O'Gean followed the law here. He followed the law not only in 2016, but he also had a crystal ball and followed the law in 2018 and 2019. And the bottom line is his factual determination, that's what it was, his factual determination that the competing evidence was not susceptible to getting a good, solid value figure, that's not clear error. And if you can't find clear error on that factual determination, then he is allowed to follow the law under Hyundai, follow the law under Yamada, and he's allowed to exercise his discretion. I'm going to dispense with the valuation crosscheck. And by the way, even if he had to do a valuation crosscheck, if it doesn't come up all better roses, that doesn't mean you throw out the lodestar and the multiplier he awarded. It just means, according to Bluetooth, take a second look. And no one took a harder look at the lodestar. We start with the lodestar. So there's no question about the calculation of the lodestar. And it seems to me that what we're talking about here is the application of the multiplier. And to that extent, the redemption value, I guess, is a part and parcel of that analysis, I would assume, right? No, because the en banc panel in Hyundai said you go through the Hanlon and Kerr factors, and those factors don't talk about coupons at all. Those factors don't call about the dollar value. They don't talk about proportionality. And, in fact, the dissent in Hyundai wanted to impose a proportionality requirement, but the majority in the en banc panel disagreed and didn't do that. The dissent also wanted to impose for the multiplier... So I'm clear about this. Your position is that you're not satisfied with the $8 million lodestar. You want the multiplier on top of that, right? Yes, we want the fee that was awarded by Judge McGee. So we have to evaluate whether or not that multiplier was correctly assessed as a matter of law. There are a lot of features to that. I think one of them subsumes the concept of the evaluation of the redemptions. But other than that, they have a lot of things that were said here, which I have some problems with, in terms of whether they were correct standards by which you measure a multiplier. Do you wish to address that? Sure, and I'm happy to hear...  you were concerned about. Well, he said a lot of things. I don't have it right in front of me, but it seems like a lot of what he said was subsumed in the normal billable rates and the hours that were expended here. This is an exceptional case. He has a lot of loose language there. I don't quite get a good handle on that. Well, the first thing he said was he looked at all the handling curve factors, which we know are the correct factors from Hyundai. He said nearly all of them, the ones that apply, support a positive multiplier. He pointed out contingency risk. In Hyundai, there was a 1.55 multiplier that was affirmed. That was affirmed and described as modest by the Hyundai Ombang panel. And in Hyundai, it was the EPA that generated most of the value of that settlement. The lawyers there simply took the EPA-bandaided reimbursement program and made it better. We had risk throughout our entire case. So contingency risk was the big one. Judge Ogin was very impressed how he took an 11-state, single-state class case when given the front-load washing machine decisions in the 6th and 7th Circuit. Our best day on class certification was probably going to be liability-only certifications. He was impressed that we got basically a full recovery of out-of-pocket damages nationwide. And he went through each and every one of those handling curve factors and said all of them that are applicable apply. But contingency risk clearly is one of the key ones and clearly that he was impressed with the results based on a qualitative analysis that class members had a warranty claim and the recovery literally is a 100% recovery of a warranty claim. And that's the kind of discretionary decision where Judge Ogin was calling balls and strikes that should be affirmed unless he made an error of law, which he hasn't, or unless any of his underlying factual findings are clear error. And he explained exactly how he applied the law to the facts. He explained all the reasons why he made the discretionary decisions he did. And that comports with the handling and curve factors. And if Whirlpool or the objectors think that he should have, you know, did the links of the chain in a different way, that's just not subject to an abuse of discretion reversal. So you have the Hensley case where the Supreme Court said that a multiplier could not be awarded due to success simply by virtue of a trial court's finding that the relief secured was substantial and of significant import. How do you square his decision with Hensley? It squares with the Jambank panel in Hyundai, which made the distinction between the standards for statutory fee-shifting cases where you can't have a contingency enhancement don't apply to these kinds of class actions. Our case is exactly the same as Hyundai, as Mr. Pincus said, all cases are CAFA cases. We had a program to compensate class members, and that's what happened in Hyundai. And there was a separate agreement that fees... But in Hyundai, there was a settlement fund that the attorney's fees was a percentage of the settlement fund, right? The attorney's fees were paid separately from that settlement fund, and the fees were calculated on the Lodestar basis. The only difference being, unlike the court in Hyundai, Judge O'Geen actually had our daily time record, so it was a more robust load sort of determination. But can you actually effectively deal with the multiplier if you do not know what the settlement value of the fund was? Yes, because the Jambank panel in Hyundai said that it makes no logical sense to require the percentage cross-check when evaluating this Hanlon and Kerr factors. So the Jambank panel in Hyundai is binding, and that gives the answer to the question. And, well, going through the Hanlon and Kerr factors, the degree of success, is an important factor which may in some way touch upon how good of a settlement it is. That's the distinction that the court in EasySaver made, which was instead of doing a quantitative comparison, what's the dollar amount, you could do a qualitative comparison of, well, if you have an individual claim and then you line that up with the settlement, how does it look like? And that's why I started with that if you had a past overheating event or a future overheating event, you're basically getting a full recovery. And even if you had no overheating event like Mr. Munro, his grandfather, you're still getting something, and that's why on a qualitative assessment we passed the EasySaver test, and certainly we passed the Jambank panel's standard in Hyundai for multipliers. Now, again, people may agree or disagree with that. We talked about other cases before, whether it's Inkjet or whether it's the Concepcion case. There are cases where people disagree or agree whether the court's got it right or wrong, but this court is... the Hyundai Jambank panel decision is binding on this court, and that just gives us the answer. Great, thank you. Okay, thank you very much. I appreciate the extra time. So to pick up where the discussion left off, we think there's zero justification for an upward multiplier here, and what's required is a downward multiplier, and I think it's important to line up this case with Purdue where the Supreme Court was very specific about multipliers and said they're rare and exceptional and that they have to be proven with specificity and that the burden is on class counsel to prove them and that the court couldn't rely on impressionistic views of the settlement, and that's exactly what happened here. So the upward multiplier certainly can't stand, and we think when the value is calculated, what's required is a downward multiplier. Let me turn to Hyundai because my friend relied a lot on it. There was a valuation of the settlement in Hyundai, and if the court mentioned two different values, $140 million or $159 million, the fees were $9 million. So if you lay that against this case, 30 times as much, in our view, recovery for the plaintiffs and a significantly lower fee. The court in Hyundai did not say that it was adopting the district court's rationale for the multiplier. It recited those rationales, and it then said those limited multipliers were fine, and we think the best interpretation of Hyundai is that the court looked at the value gained and said there was no reason to disturb what was going on here. It certainly did not say, and there's no holding in Hyundai, that the rules that this court has applied in all kinds of settled cases that the generally applicable standards apply somehow went out the window with Hyundai. Reading that case sub silencio to make that determination would be shocking. Just to turn to E-Z-Saver and HP for a minute, HP's holding is not dicta because what HP said is that the shall in subsection A controls in all cases. And so what it says is if fees are going to be calculated by reference to the coupons, that they must be calculated by percentage of recovery, but there's a second alternative, which is to ignore the coupon value and just calculate the load star and any upward and downward multiplier with respect to the other relief obtained. Here, of course, we don't have the value, so we can't make that calculation. To the value of the total settlement. Yes. So you can do that. So basically the InJet case doesn't preclude the use of a load star without having to carve out separate categories for redemption on the one hand and load star circumstances on the other. You don't see this as E-Z-Saver being inconsistent with that? No, I think both cases are consistent. E-Z-Saver is right on point because as Your Honor pointed out, there was a monetary recovery, but both cases say that you have a choice. Either you take account of the coupon part of the recovery, but that has to be percentage of recovery, or you disregard it and apply the load star with respect to that. The language in footnote 11 is quite clear on that. And there's a quote on page 758 of the court's opinion, CAFA thus allows courts to use the load star approach to determine any portion of attorney's fees not attributable to coupons in mixed settlements that award both coupon and non-coupon relief. That's the standard that we've been arguing for. In terms of what my friend said about the record and the facts, here the district court didn't make those kinds of determinations, and we do have a lot more information. We may not have complete information about what the class will get, but we have a lot more information so that on remand the district court is in a position to make the requisite determination, certainly about the ceiling of what kind of claims could rationally, on any rational view, be expected here. One last point. My friend referred to safety. This is not a safety settlement. This is a goods settlement. There's no warning to the class about safety. There's no recovery for property damage. The CPSC looked at this question and declined to take action. So this is a run-of-the-mill coupon case, not a safety case. Thank you. Thank you. Your Honor, in my haste I neglected to mention, as I agreed with Objector McDonald, that he was also mistreated. He availed himself of the rules of discovery and had his brief struck as a result. In response to the Attorney General, because they now don't take a case, I think it's important for us to take a position, which is that we believe EasySaver presents an exception to the general rule from HP Inkjet Printer, which is that if you can reduce the fees and that fee goes back to benefit the class, then you don't have to disturb the entire settlement. But because of the structure of this settlement agreement, that's not possible. And our reading of EasySaver at page 762 would be that even the EasySaver panel would have reversed the entire settlement agreement in this particular case. And we also agree with the Attorney General that the district court could have done a rolling fee. And the difficulty of that was created by the settling parties, and it's unfortunate that they structured a settlement that way. But that doesn't justify violating CAFA to deal with that inconvenience. Thank you. Thank you. The case has been submitted.
judges: Clifton, Block, Lee